Next case, Continental Tire Company of North America v. Industrial Commission, 5100221, Casselipe. Judge Stewart has recused himself in this case. Judge Wexton will sit as a panel member. He is not able to be here this morning, but he will have the benefit of everything that we have with respect to this case. He has the brief. He has a summary disposition of the referral of the case. He has had an opportunity to hear all these matters. He will have an opportunity to hear the final arguments of counsel, and he will be an active participant in the decision-making process of this case. Please proceed, counsel. May it please the Court, Mr. Levenhagen. My name is Cheryl Introvaya. I'm here on behalf of Continental Tire. This is an appeal from the Illinois Workers' Compensation Commission regarding a case that was tried on a 19B. There are actually five issues that are on appeal. Four of them have a manifest way to the evidence standard, which included the finding of accident causation, the awards of TTD medical expenses and travel expenses, and the remaining issue involves the statutory section 8A3. We have requested the Court to review that language, and we are requesting a de novo review of that section as it applies to this case. Mr. Simpson alleged a work accident on June 30, 2006. On that day, he claimed he was pulling a preform, which is a piece of steel that's approximately 30 pounds, out of an extruder, and he placed his hand on the machine, pulled on it, and felt a burning electrical shock pain at that time. Mr. Simpson, by his own admission, stated that he did not report the injury to his employer at that time. Following the 30th, the plant had a scheduled shutdown over the 4th of July for that week. So, Mr. Simpson was off work until July 9, 2006. While he testified to being in pain and laying in a recliner this entire time that he was off work, at no time did he ever seek any medical treatment for the alleged injury or any of his symptoms. He then returned to work on July 9th, proceeded to work the next four days, and on the 13th, he called his wife and said he was in pain. Now, his wife works at Good Samaritan. She told him to come to the hospital. When he seeks medical treatment, he does not tell the hospital staff that he is there for an injury. He tells them he has a burning pain down his arm and that he has no injury and that he's had this condition for two years, but it's been worse in the last week. With that in mind, the hospital thought he was having a cardiac event, which he obviously was not, and they eventually took an MRI, and the MRI revealed defects in the cervical spine. Even after that, he did not report anything to the hospital to say this was a work injury. And basically, when you get to determine whether somebody has had an accident or not, the case law in Illinois makes it perfectly clear that while a petitioner's testimony is sufficient to support a finding for a work accident... Under a chain of events theory. Yes, sir. And when their testimony is supported by records that also show that this is what happened, then that's good enough. In this case, there were no witnesses, and we have a gentleman showing up at a hospital 13 days after his alleged accident, specifically saying he didn't have an injury, and then eventually reporting an accident to his employer on... Those facts don't show behavior consistent with a work accident. And I understand that the level of review is manifest way to the evidence, and that is at an extremely high level. However, it requires the decision to be vacated if an opposite conclusion is clearly evident. And in this case, we believe the facts rise to that level, and we have asked the court to review it with that standard. Let me ask you this. In addition to the... Does this case really stand or fall on the claimant's testimony only? I mean, what do you make of the testimony of Drs. Barnett, Miller, and Section 12 by Dr. Ransel in support of finding that the current condition was causally connected? Does it really stand or fall simply on the claimant's testimony? Well, assuming that you believe everything that he says, then you're going to get to the findings of all of those physicians. None of those physicians had any other information. In fact, when Dr. Ransel actually was provided with the report from the medical facility at Good Samaritan, he basically came to the conclusion he pulled back on his finding of causation. I don't know if Dr. Gornett... I think Dr. Gornett testified that to him it was reasonable for him to have had this delay, but it all falls back on what the physician said. What it boils down to is, to answer a colleague's question here, it seems to me, is that was there an accident? And all the doctors who are basing their causation opinion are based upon the claimant's claim of an accident at that date, time, and place. Well, and the accident is the only event that anyone could have been aware of, because no one knew about the accident on the 30th. So while he's off that whole week, maybe it happened then, who knows, but there would have been no way for Continental Tire to even look into the event without even knowing that the accident had occurred. So basically the case rises or falls upon a credibility determination of whether there was an accident. That's correct, Your Honor, and that's why we put some of the other instances of what the petitioner testified to at the hearing as opposed to what was actually in the records as support for finding that his testimony was not sufficient to make the finding of accident in the first place. Well, if the standard falls on the credibility of the claimant, ostensibly, who makes the determination regarding credibility? Well, the credibility determinations are made by the Commission, Your Honor, and like I said, when we started this out, it's a manifest way to the evidence, and it's only if an opposite conclusion is clearly evident. In our opinion, an opposite conclusion is clearly evident, because this is not what somebody does when they have a work accident. They don't not report it to their employer on the day that it occurs. They don't not go after treatment while they're off work for a week. They don't come back to work, don't report it then. They don't work another four days, still don't report it then. They don't finally get medical treatment and tell them, oh, no, I haven't had an injury, and then finally report it to their employer in writing four days later. That is not consistent with a work-related accident. What role of the work history of the claimant do you think played a factor with the Commission in finding the claimant credible? Not missing any work for the 16 years? I think it was a big part of their decision, and I don't think that the Commission looked deeply into the opinions of the treating physician, specifically Dr. Gornett, who basically said that, in his opinion, Mr. Simpson was probably in chronic pain for a good long time, given the level of degenerative disc disease that was found in both the cervical and the lower back conditions. And Dr. Kowalski's notes have the same opinion of showing that it was a degenerative condition. The difference here is that this is not a claim for repetitive trauma. This is a claim for an actual injury. And even if, you know, moving beyond whether there was or was not an accident, I mean, he was able to work up until then, but you know what? He was able to work four more days after that. And actually, he finished the shift after the alleged accident and worked four more days. The fact that he worked there for 16 years without ever having a work injury, you know, that's extremely commendable. I know a lot of people who wish they had employees that were that good. However, the fact that you're a dependable employee does not necessarily mean that all of the facts support a finding of an accident. And moving beyond accident into causation, even if you were to find that he had an accident, you know, the neck becomes the most obvious injury from this traumatic claim. And you get into the two other conditions that were awarded benefits, which include the lower back and the shoulder. And once again, when you look at what Mr. Simpson testified to and what's actually in the medical records, you start finding these discrepancies. When he reported the injury, well, obviously when he reported to Good Sam, there's nothing about a low back. When he reported the injury to his employer, there's nothing about the low back. When he goes to see Dr. Thompson, I think there was an argument made that Dr. Thompson found that he had a low back, that he addressed the low back at that time, which would have been on July 18, 2006. But if you actually read the entire report, and he's talking about spondylolethis, it goes back to the x-ray, which was on the cervical spine only. So there's really no mention in Dr. Thompson. He puts on a questionnaire for Dr. Rintzel that his back was hurting, but there was no evidence of this pain when Dr. Rintzel was examining him. In fact, if you look at Dr. Rintzel's testimony later on, he's like, when he showed up here, this was not an issue. So he had problems with it. When he goes to see Dr. Houle, there's no mention of any low back pain or injury. When he sees Dr. Kowalski, there's no finding or anything that says, I have a low back problem. When he goes for physical therapy, that is directed by Dr. Kowalski. Again, there is nothing to do with his back. And by his own statements to the pain management doctor, which he gets to from Dr. Bournette's office, he says his low back condition didn't arise until November 2006. Now if this is a traumatic claim, that's not a traumatic accident, because November is, you know, five months after the alleged accident. So in our opinion, that too, that finding that the back condition is related to the work accident, is against the manifest way to the evidence, because an opposite conclusion is clearly evident. Now, Dr. Garnett does link the two and make the statement that they are related? Yes, he does. Yes, he does. And when you look at his testimony, I'm not sure that he has all of the facts related to the time that was off. He made some comment about the back being mentioned at the hospital. That's not in the hospital record. And, you know, he then tries to, well, you know, his neck was the bigger problem. Be that as it may, once again you get into a set of facts that are not consistent with a traumatic work accident. And obviously, when you read Dr. Garnett's testimony as well, the condition in his low back was to never have this disease. And it had occurred over time. And when you look at the actual condition that he is receiving treatment for, symptoms would have been apparent long before November 2006 by the petitioner's own testimony. So we have asked that that finding be vacated as well. The other finding we have requested the court to review is the finding that the shoulder was related. And this simply comes from the treating physician, which the commission, you know, put so much reliance on. And that is because when Dr. Miller got done doing the surgery, which he originally thought there was a slap tear, which there was not, he basically testified that the labrum was not detached like you would expect with a big jerk. This is a traumatic accident. The findings that Dr. Miller made were consistent, in his opinion, of a chronic problem, not a traumatic injury like the one described by Mr. Simpson. Again, this is not a repetitive trauma claim. This is not a let's have everything worked on now that we're off work because we may or may not have had an accidental injury. It is a traumatic claim. The symptoms that he had and what he reported to everybody makes the commission's finding, in our opinion, against the manifest way of the evidence. And that is why we have asked this court to review it. The remaining two issues, the TTD, the medical expenses, the trial expenses, all stem from the treatment that was rendered related to those conditions as well as the other issues. So rather than get into that, I just want to go to the second issue, which we have asked this court to look at on a de novo review as a matter of statutory interpretation. And in the case law, the statute basically says what the employer's liability is. And they limit it to emergency treatment, the first physician, and the second physician, and the physician's recommendations and the chain of referrals thereafter. And the case that was... there are two issues here. The first being whether or not the initial treatment at St... I'm sorry, at Good Samaritan constitutes emergency room treatment. It was 13 days after the accident. Petitioner has made the argument that it was an emergency because they thought it was a cardiac event. Well, the only reason they thought it was a cardiac event was because he didn't tell them what really happened. And whereas it's his first treatment for his alleged injury, it's coming 13 days after. Petitioner testified that he could go in and see his treating physician on a walk-in basis, which was Dr. Thompson. There's no evidence why he didn't go in to see him then. The only reason he went to Good Sam, according to his testimony and his wife's, was because his wife worked there. And this was not emergency treatment. He eventually gets an MRI once they decide there's no cardiac event occurring. And so we have asked the court to... and we actually asked the commission, and you'll see in their decision they don't even address the argument with regard to the emergency room and Lyon and the case law that supports the finding that just because you go to the emergency room doesn't necessarily mean it was an emergency visit. And so we've asked the court to look into that matter as well. And what kind of relief would you expect if they agreed with you? I would expect you to find it as a choice. Well, what if you find that it's just a separate incident of the fear of a cardiac event and you just don't have to pay for that visit? Well, if that's how you wanted to view it... Well, I think that you're arguing it that way. The problem you get into is that he actually had referrals to two orthopedic surgeons after he left the emergency room. He chose not to go to any of those. In fact, his wife called Dr. Houle's office when they left the emergency room trying to get an appointment with Dr. Kowalski, who was busy, so she was eventually able to get one with Dr. Houle, who was also in the same office. So, I mean, we have one set of treatment. They say, you go see Dr. Froehling or this other doctor. You know, she's now looking for it with Kowalski and Houle. Then they go to Dr. Thompson in the middle, and Dr. Thompson refers them to Dr. Goccio, another one they don't go to. And the question that we move into is what's first, what's second, what's third, and is the first emergency room even... Is it an emergency room or is it actually a choice? And under Lyon, it's a choice. But then when you move from there, the question... Counsel, your time is up. You'll have time on rebuttal. Thank you, Your Honor. Counsel, please. Thank you. May it please the Court, my name is Fritz Levenhagen. I'm representing the petitioner in this case, Brian Simpson, and Brian and his wife are here today. This is an important case to them and I know to the court as well. Did the arbitrator prefer his own decision or is this one that you submitted to him? I submitted a proposed decision to the arbitrator. This is... I can't tell if it's identical, but it's close. And it's based upon the facts that were submitted at arbitration. My client worked for 16 years without having a single lost time accident. There are records, documents in the file, wage records, show that he worked on a regular, continuous basis, did not miss a day of work, for the whole year preceding the accident. The average weekly wage was not at issue, but in those wage records it shows the type of work that he was doing and that he was doing it day in and day out, up until this injury was out difficult. And that is what he testified to at arbitration. Counsel, what do you make of your opponent's argument that the behavior of the claimant was contrary to sort of human nature? If he had this injury, why did he not report it to a series of events until later? Well, what I would say in response to that is he did not have a work-related injury before then, and he was hoping that the pain would subside and go away. It did not. His wife testified about the difficulties he was experiencing at home. It just so happens that after his injury, the plant goes on plant shutdown every year in July. And it's shut down for two weeks, so he's not at the plant any longer. But when he does go to the doctor's office, well, initially he goes to the emergency room at the hospital, they do do an MRI of the cervical spine. Why things got confused at the hospital, when he's there for neck pain they do the cervical MRI, but then they send him to the cardiac unit, I don't know. He doesn't know either why that happened. But that shouldn't be held against him. He was there, he presented with the complaints of neck pain, he attributed it to his work injury. They didn't get the records down right. Well, it's like Dr. Reinsel said in his later report, it is confusing. Did he present himself at the emergency room with complaints of neck pain or arm pain? He complained of neck and arm pain. But, again, the records don't verify that, and again, they send him to the cardiac unit. But when he goes to the... The records don't verify what? That he made those complaints? Well, yeah, that he attributed those complaints to his work injury. But there will be records that say I presented with neck pain and arm pain, or is it I just went because I had arm pain? No, he went because he had neck and arm pain at that time. Now, if you read Dr. Thompson's note, he notes that initially he had severe neck pain, and then he also had spondylolisthesis in his low back. And that was on July 18th. So it's a short period of time from the date of his injury until he's at his family physician, Dr. Thompson, who's seen him for 20 years. And Dr. Thompson came and testified live at the trial of the case and verified that he'd been his treating physician. Well, nowhere in the records are there any prior complaints of injuring his neck or back until this incident that occurs at work. So why are things... Why are they confusing initially? Well, perhaps because he's never been hurt like that before. When Dr. Gornett sees him, he says his neck was so stiff it was like a board. And when Dr. Houle sees him in July, he also notes that Brian had severe neck pain and rated an 8 on a scale of 1 to 10. He could hardly move his neck. So when they asked him why didn't he tell them about his low back, well, his neck pain was overshadowing any problem he had. He'd already been diagnosed with a herniated disc, as revealed in the MRI scan at the hospital. He'd never had an MRI scan before. He'd never been to an orthopedic surgeon for any neck pain or back pain before this. He had never missed work before this for any injury or illness. He was off from work from July 2008 and continued off until the date of arbitration almost two years later, undergoing the treatment. Dr. Renssel, the company doctor, who saw him at the request of the workers' compensation carrier, verified that this trauma that Brian sustained at work when he was lifting that preformer out caused the herniated disc and the surgery performed by Dr. Gornett was reasonable. That's even after looking at the hospital record. So when opposing counsel... That's for the cervical work. The cervical work. So when opposing counsel says, well, why did he say that? Well, why didn't he mention it to the hospital? I don't know, but if he had gone into the hospital and said that he had been pulling the preformer and had foot pain and then saw Dr. Renssel for foot pain, I'd say that Renssel would probably say that. It doesn't have anything to do with it. But the way he described it, and if you look at the accident report, it states in there, and that's filled out by his employer, that why he wasn't able to report it immediately. His employer believes him on what happens and what takes place. Even when he goes to Renssel, Renssel says, yes, that's consistent. The mechanism of injury is consistent with this type of diagnosis. And the same thing, the testimony of Dr. Gornett, the injury report supports how the accident happened, when it happened, the date of accident is correct. Every medical record from Dr. Miller, Dr. Gornett, Dr. Houle, they all have the same mechanism of injury. We're talking cervical here. Cervical and the low back. Where do we get that connection with the low back? I think the opposing counsel was suggesting that one of the doctors suggested that it was that bad that should have been pain before the incident. Well, that's true. One of the doctors did say that. The treating board certified orthopedic surgeon, Dr. Gornett, testified that with the severity of the neck pain that Brian was experiencing, he would not have thought that it would be anything unusual for him not to complain of the low back. His neck was so bad, it overshadowed his low back problem. But if you look at Thompson's record, he makes mention of the low back when he sees him in July. So something must have happened there to cause that low back pain. Brian testified that he was having low back pain in July following the injury at the end of June. His wife also testified that he was laying around the house having low back pain. She testified about that as well. Is there anything in these records that the opposing counsel suggested that there was a statement made by the claimant of some condition for two prior years? Yeah, there's a scant reference to that in one of the records, and there's no history of any prior injury. No history of treatment? No, no history of treatment. And my client doesn't know why that's in there. As far as the records, there are always inconsistencies in the records. Sometimes my clients who have no children have four children. Some of my clients who don't smoke in the medical records, they smoke four packs of cigarettes a day. I mean, what can my client do about that? Well, he can write a complaint, but it doesn't change the medical record. It is what it is. As far as the argument on the choice of physician, even if you say that the emergency room visit at Good Samaritan was not an emergency, well, the next doctor my client sees, Dr. Thompson, Dr. Thompson prepares a written referral to Dr. Gornett. It's in the record. My client proceeds to treat with Dr. Gornett. So it's still within his first two choices of physician. First, assuming that you say that the Good Samaritan appointment is not an emergency, that's one. Two is Thompson, and he makes the referral to Gornett, who in turn makes the referral to Miller, and it's all within the two chains of referral. So what do you perceive opposing counsel's complaint to be your argument, that your client or his wife found the doctor initially? Well, that may be their argument. Yeah, I'd perceive that. Well, that's as the court and Justice Hoffman's decision in absolute cleaning recognized, the genesis of the referral does not make any difference to the court. As long as there's a referral, the treating doctor referred it ultimately. It doesn't matter what the original source of the information was. That's correct, and that's what Dr. Thompson testified to. He testified that he has referred people to Washington University School of Medicine. That happens to be where Dr. Gornett practiced initially, and he is affiliated with them. And then if you look at Dr. Thompson's CV, that's where he went to school, was Washington University. But regardless, it is still within the chain of referral. As far as Dr. Renssel's opinion. Is there any referral out that was actually acted upon from the emergency room visit? They had been referred to Dr. Kowalski. But no appointments were made, no services rendered. Later, he did see Dr. Kowalski. How did he get to Kowalski? It's Houle's partner. Kowalski wasn't available from the emergency room, so they went to Houle, his partner, and saw him. Was that a referral? No, it wasn't exactly a referral. But my client did not pursue further treatment. He went with Dr. Gornett at the referral with Dr. Thompson and continued to treat with him through the day of trial. This was a 19B proceeding. The facts are there in the record. The facts are contained not only in the medical records, but in my client's testimony and in the testimony of the treating physicians and even the testimony of the examining physician, Dr. Renssel, who agrees that this gentleman's neck injury, at least that portion of it, was related. Dr. Gornett said the neck and the back is related. Dr. Miller said the shoulder is related. So it's all through the medical records, and the facts are there to support the decision of the arbitrator, which was unanimously affirmed by the commission, which was in turn affirmed by the district court. There's no reason for statutory interpretation here. As the case of absolute cleaning recognized,  In addition, in this case, it's supported by the claimant's testimony. Dr. Thompson made the referral. In fact, my client's wife produced the original document at the time of trial. So we would request that this court affirm the decision of the Workers' Compensation Commission.  A rebuttal, please. Thank you, Your Honor. Addressing some of the statements that were made by Petitioner's Counsel, with regard to the lower back, it was Dr. Granberg to whom the petitioner actually provided the statement that his back pain did not begin until November 2006. You will find that on pages 1350 and 1351 of the record. With regard to Dr. Thompson and his alleged finding with regard to the back, the date he saw Dr. Thompson, the report does not mention the word back at all. And if you read it, it says he was post-ER visit a week and a half ago, injured at work, been working ever since. Missed one day last week, had an appointment with Kowalski for his neck. Keeps going about the neck. X-ray of the neck shows spondylolisis of the spine. Also has foramenal and discogenic disease from disc trouble. You keep going on through the medications he's taking. On exam, he had scoliosis. All about the neck. Reflexes are normal and equal. Weaker on the right side than the left. Right hand good. Impression, HMP, with radiculitis, right arm, spondylolisis of the spine, secondary to an injury at work. The only mention of spondylolisis in this record is from the X-ray. That was only taken at the cervical spine. So I don't know where the petitioner's attorney is getting lower back from that. But clearly from Dr. Thompson's record, it does not mention the lower back. And moving on to the chain of referral. Petitioner's counsel has stated to you that no statutory interpretation is required in this matter. And he brings up the absolute cleaning case. The absolute cleaning case recited the case which in our original brief we said had never been recited. And I'm telling you this simply because  addressed the actual language found in the statute. And if you actually read the statute, the statute specifically requires a recommendation. A recommendation. This is not a recommendation. Dr. Thompson had absolutely no idea who Dr. Vornette was. In fact, the petitioner testified that Dr. Thompson didn't recommend him. That he went in there and asked for him. Our statute specifically uses the word recommended. And the sentence in the statute says, All medical, surgical, and hospital services provided by the physician, surgeon, or hospital initially chosen by the employee or by any other physician, consultant, expert, institution, or other provider of services recommended by said initial service provider or any subsequent provider of medical services in the chain of referrals from said initial service provider. So the word recommendation goes to the initial service provider pursuant to the statute. Now, that language, I understand that language. Here we have a fact pattern where information was provided to Dr. Thompson. Dr. Thompson testified he then did some research on his own before he actually made the referral. Is that accurate or not? And does that then take into a recommendation? No, because they went in on September 21st. They said they talked to Dr. Thompson. Dr. Thompson flat out denied this. He said he never talked to him. They walked in. They talked to his nurse. The nurse filled out the note and all he did was sign it at the bottom. Now, when he may have been provided information at a later date and reviewed it, I have no knowledge of that. There was never any information put into the record that showed what he might have been given or when that finding was made. But clearly, based on Dr. Thompson's own statements, he had no idea who Dr. Gornett was. He didn't talk to him when they came in. They came in wanting a referral. The nurse filled out the slip. He signed his name at the bottom. And by Mr. Simpson's own testimony at the hearing, he specifically said that Dr. Thompson did not recommend Dr. Gornett. He went to Dr. Thompson to get the referral. What about this argument? That your interpretation exalts form over substance. What about if you're in an area where there's limited experts in this field? The claimant comes in and blurts out the name of the person that they've heard about. According to your interpretation, that would foreclose the treating physician from ever referring these people to the doctor, correct? Not necessarily. Why not? Because if you're a physician, you have a duty to refer your patients to someone who you know something about. If I went to my doctor and asked for a referral for a cardiac surgeon, I would assume he would send me to someone who he knew something about or someone with a reputation of something he'd heard. And what limits the time? So the doctor couldn't do his foreclosure doing the doctor did in this case, did his own research, and then concluded that this was somebody that he would recommend simply because the claimant mentioned him first. It doesn't preclude it, but that's not what happened in the case because Dr. Thompson never even spoke to him. Well, Thompson wrote a referral, did he not? Did he not sign off on it? He didn't recommend him, and that's by the petitioner's own testimony, and that's what the statute requires. I know you think it's form of oversubstantiation. Well, you said you thought about it. Your time is up. Okay, thank you, Your Honor. As I've indicated, Judge Wexton of the Appellate Court of the Fifth District is a member of this panel for this case and will be an active member. We'll take the matter under advisory for disposition. We'll stand in recess subject to call.